IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

WILLIAM R. BEST, JR.,          *
                               *
          Plaintiff,           *
                               *
v.                             *     CIVIL ACTION NO. 17-00042-CG-N
                               *
HARRIS HUFFMAN, *et al.*,      *
                               *
          Defendants.          *

## **REPORT AND RECOMMENDATION**

Plaintiff William R. Best, Jr., a former prison inmate proceeding *pro se*, filed his complaint[1] under 42 U.S.C. § 1983. (Doc. 1, 6, 46, 64). This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72(a)(2)(R), and is now before the undersigned on Defendants' Motion for Summary Judgment. (Doc. 70). After careful review of the pleadings, and for the reasons set out below, it is recommended that Defendants' Motion for Summary Judgment be **GRANTED** in part and **DENEIED** in part, with the only remaining claim being the Eighth Amendment claim of deliberate indifference asserted against Defendants Sheriff Huffman, Warden Brown, and Dr. Davis in their individual capacities. It is

---

[1]    Plaintiff originally filed his complaint on November 29, 2016. (Doc. 1). However, he has filed subsequent and amended complaints (Docs. 6, 46, 64) which incorporate by reference portions of previous filings. Thus, the Court will collectively refer to these pleadings as "the Complaint" unless otherwise noted.

recommended that all other claims be dismissed for the reasons stated in this report.

## I.    Summary of Allegations.

Plaintiff Best brings this action against Dallas County, Alabama Sheriff Harris Huffman, Warden David Brown, Dr. Glenton Davis, and Dallas County, Alabama asserting various federal law violations relating to inadequate medical care received while incarcerated at the Dallas County, Alabama Jail ("the jail" or "Dallas Jail").

Plaintiff was booked into the jail on April 8, 2014 on multiple charges of sodomy, rape, and incest involving his step-daughter. (Doc. 24 at 1). On June 8, 2015, Plaintiff plead guilty to first degree rape and incest charges. (Id.). Plaintiff was transferred into Alabama Department of Corrections custody on June 10, 2015. (Id. at 2).

Plaintiff claims, while held and incarcerated at the Dallas Jail, he and his attorney made numerous requests to Sheriff Huffman and Warden Brown for medical attention due to diabetic complications, namely vision loss. (Doc. 1 at 2). He alleges the medical requests were ignored and delayed until the Selma Lion's Club intervened and covered the cost of an ophthalmic examination. [2] (Id. at 2-4). Plaintiff brings multiple claims

---

[2]    According to Plaintiff, he was treated at the Cahaba Center for Mental Health by Ms. Goree for depression (due to his loss

against Defendants' relating to the alleged inadequate medical treatment he received while incarcerated at the Dallas Jail, for which he seeks relief in the form of monetary damages, $500,000.00 from Defendants Huffman, Brown, and Davis and $4,000,000.00 from Defendant Dallas County, Alabama. (Doc. 1 at 4; Doc. 46 at 1-2).[3]

Defendants have answered the complaint, denied each allegation against them, and filed Special Reports in support of their position. (Docs. 21, 22, 24, 55, 56, 66, 67, 69). Defendants assert the defenses of sovereign, qualified, and state immunity and additionally argue that Plaintiff's action is

---

of vision), and she worked to obtain a free eye exam through the Selma Lion's Club. (Doc. 41 at 2).

[3] In addition to monetary damages, Plaintiff Best also requests that he be awarded "a directive from the court to prevent any further incarceration of [himself] or anyone else without proper medical attention being provided." (Doc. 1 at 4).

The law is settled that a § 1983 action filed by a prisoner seeking injunctive or declaratory relief becomes moot once he is transferred or released from the facility where the cause of action arose. See Elend. v. Basham, 471 F.3d 1199, 1207-08 (11th Cir. 2006) (an immediate threat of future harm must be present for a plaintiff to have standing for injunctive relief). At the time Best filed his complaint, he was incarcerated at Easterling Correctional Facility. Given that all of Plaintiff's alleged violations occurred in the past, Plaintiff has failed to allege any ongoing, continuous, or future harm at the hands of the defendants. Likewise, Plaintiff has failed to allege any threat of future harm. Thus, his claim for injunctive relief is moot. Spears v. Thigpen, 846 F.2d 1327, 1328 (11th Cir. 1988) (Plaintiff "was transferred to another facility shortly after his complaint was filed. . . . At that point, his claims for injunctive and declaratory relief relating to the conditions of his administrative segregation at the West Jefferson facility no longer presented a case or controversy.).

barred by the PLRA's exhaustion requirement as well as the statute of limitations. The Court has converted the Defendants' filings into a Motion for Summary Judgment (Doc. 70), to which Plaintiff has repeatedly responded. (Doc. 30, 35, 42, 72, 73). After a thorough review of the record, the Court determines this motion is ripe for consideration.

## II. **Summary Judgment Standard.**

Summary Judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'" (emphasis omitted)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of

material fact." Celotex, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. See Anderson, 477 U.S. at 255.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F. Supp. 2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013) (citations omitted).

The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to material facts." Garczynski, 573 F.3d at 1165 (internal citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. Id.

In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); see also Logan v. Smith, 439 F. App'x 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted) (unpublished)).[4]

## III. Discussion.

Plaintiff alleges that Defendants Sheriff Huffman, Warden Brown, Dr. Davis, and Dallas County, Alabama acted with deliberate indifference and in violation of the Americans with Disability Act and the Equal Protection Clause of the Fourteenth Amendment when Defendants denied and/or delayed him diabetic

---

[4]    "Unpublished opinions are not considered binding precedent, but may be cited as persuasive authority."  11th Cir. R. 36-2.

medical treatment and related care. Plaintiff claims that the inadequate medical treatment, specifically the delay in receipt of treatment, caused his vision to reduce to the state of permanent blindness. (Doc. 46 at 1-2). Plaintiff further claims that the supervisory defendants are liable for negligent hiring, training, and supervising of their employees and the harm caused by the acts of the subordinates which caused Plaintiff to go blind. (Id. at 2). Plaintiff seeks to recover monetary damages from each defendant.

In response to the suit, Defendants deny all allegations against them, have asserted available immunity defenses, and argue that Plaintiff is barred from bringing this action based on his failure exhaust his claim or timely file suit. The Court will now address the parties claims in turn.

**A.    The PLRA's Exhaustion Requirement.**

In their Motion for Summary Judgment, Defendants argue that Best is barred from bringing this action due to his failure to exhaust administrative remedies as required by the Prisoner Litigation Reform Act ("PLRA"). The PLRA states that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  "Section 1997e(a) is intended to force inmates to give authorities a chance to correct constitutional violations before resorting to federal suit and to prevent patently frivolous lawsuits." Horne v. Nevil, 2017 WL 9486058 at *4, 2017 U.S. Dist. LEXIS 44613 at *9 (S.D. Ga. March 7, 2017). "Congress has provided in §1997e(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative remedies." Booth v. Churner, 532 U.S. 731, 741 n.6, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001).  Further, the exhaustion requirement of the PLRA "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong," Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002), and is required even if the available administrative remedies are futile or inadequate. Harris v. Garner, 190 F.3d 1279, 1285-86 (11th Cir. 2005).

Exhaustion of all available administrative remedies is a precondition to litigation and is mandatory. See Ross v. Blake, __ U.S. __, 136 S. Ct. 1850, 1853, 195 L. Ed. 2d 117, 120 (2016) ("That mandatory language means a court may not excuse a failure to exhaust, even to take "special circumstances" into account.); Woodford v. Ngo, 548 U.S. 81, 85, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory."). The Supreme Court has

noted that each prison sets its own administrative remedies, Jones v. Bock, 549 U.S. 199, 218, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007), and that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Woodford, 548 U.S. at 90-91. Thus, prisoners must go beyond merely filing a grievance and are required by the PLRA's exhaustion requirement to "properly take each step within the [prison's] administrative process," including appealing denials of relief. Johnson v. Meadows, 418 F.3d 1152, 1157 (11th Cir. 2005).

> In order to determine whether Plaintiff fully exhausted his available administrative remedies, the Court thus first examines and consider [sic] both the Defendants' and the Plaintiff's version of the facts, taking the Plaintiff's version of the facts as true. *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008). "If in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." *Id.* If the complaint is not subject to dismissal at the first step, then the court shall proceed to make specific findings in order to resolve disputed factual issues related to exhaustion. *Id.* The defendants bear the burden of pleading and proving that the plaintiff has failed to exhaust available administrative remedies. *See Jones v. Bock*, 549 U.S. 199, 216, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007).

Shepard v. Fla. Dep't of Corr., 2017 U.S. Dist. LEXIS 53046 at *24-25 (S.D. Fla. Apr. 5, 2017).

The Supreme Court has specified three "circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." Ross, 136 S. Ct. at 1853. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end - with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Finally, a grievance process is rendered unavailable "when prison administrators thwart inmates from taking advantage of [it] through machination, misrepresentation, or intimidation." Id. at 1860. The law is also well settled that "the question of exhaustion under the PLRA [is] a 'threshold matter' that [the court must] address before considering the merits of the case." Myles v. Miami-Dade Cnty. Corr. & Rehab. Dep't, 476 F. App'x 364, 366 (11th Cir. 2012) (quoting Chandler v. Crosby, 379 F.3d 1278, 1286 (11th Cir. 2004)).

The Eleventh Circuit has set out a two-part test to determine whether or not a suit may be dismissed for failure to exhaust administrative remedies. See Turner v. Burnside, 541 F.3d 1077, 1082 (11th Cir. 2008). First, a court "looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, take

the plaintiff's version of the facts as true.  If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed."  Id. at 1082.  If the complaint is not subject to dismissal, then the court "proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion."  Id.

In the current action, Defendants have submitted that the jail provides an administrative remedy for inmate complaints through a grievance procedure which is laid out in the Dallas County Jail Inmate Handbook, a copy of which "is issued to inmates at booking."  (Doc. 24 at 3-4; Doc. 24-1 at 3-4). Defendants explain this procedure as follows:

> The Dallas County Jail has a grievance policy for inmates to express complaints with the conditions of their confinement.  When an inmate has a grievance, he or she may request a Prisoner Request Form from a Corrections Officer.  This form is then collected by Corrections Officers.  Prisoner Request Forms are also used by inmates to request medical care.  The LPN normally collects any medical requests form at pill call.  However, if an inmate gives a form requesting medical care to a Corrections Officer, the Officer will pass it to the LPN.
>
> Warden Brown reviews all grievances and ensures a copy is placed in an inmate's file.  If an inmate is dissatisfied with the response to the grievance, he or she may appeal up the chain of command to the Sheriff.

(Doc. 24 at 3; Doc. 24-2 at 2-3).  Defendants affirm that Plaintiff failed to submit a grievance form concerning the

allegations that are contained in this lawsuit and, therefore, failed to follow the grievance procedure in place at Dallas County Jail. (Doc. 24). Plaintiff, on the other hand, asserts that he filed grievances related to the facts of this lawsuit and was denied medical treatment until Cahaba Mental Health intervened and obtained medical care for him. (Doc. 1 at 2). Taking, as it must at this stage, Plaintiff's allegations to be true, the Court "proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion." Turner v. Burnside, 541 F.3d 1077, 1082 (11th Cir. 2008) (citing *Bryant v. Rich*, 530 F.3d 1368, 1373-74, 1376 (11th Cir. 2008)).

A review of the record reveals that on the Court's Prisoner Complaint Form for § 1983 actions, Plaintiff checked "Yes," that he presented his complaint through the prisoner's grievance procedure, but the record is void of any actual grievance form submitted or complaint letter filed. In describing the actions he took to comply with the jail's grievance policy, Plaintiff stated he "fil[ed] numerous requests to the Warden requesting medical attention," but "all requests were ignored until the matter was addressed by intervention through Cahaba Mental Health." (Doc. 1 at 2). Plaintiff further affirms that Defendants Huffman and Brown were notified through personal conversations, multiple times, by himself and through his attorney, that Plaintiff was in need of medical care for vision

loss due to his diabetic condition. (Doc. 1 at 3-4). These third-party conversations, however, fail to qualify as the filing of a grievance per Dallas County Jail's administrative remedy policy as provided by Defendants. Consequently, these facts show Plaintiff has not exhausted his administrative remedies. Ordinarily such evidence would be sufficient to bar Plaintiff's suit pursuant to §1997e(a), but Plaintiff raises the question in his Response to the Motion for Summary Judgment, of the "availability" of the jail's administrative procedure for medical care complaints.

In his Response, Plaintiff argues that no actual grievance or appeal policy exists at the jail for situations other than disciplinary proceedings. (Doc. 73 at 10-11). The Dallas County Jail Inmate Handbook states:

> Inmates who have a specific question involving a personal problem, have a complaint about some aspect of the daily operation of the Jail or have a request for information are allowed to seek answers and redress through the Inmate Request Form.
> . . .
> An inmate with a specific question or complaint should contact a Correction Officer. The question or complaint will be recorded on the Inmate Request Form, and the form must be signed by the inmate.
> . . .
> An inmate who desires to appeal a decision of a *disciplinary hearing* on a specific disciplinary may take the following actions:
>
> 1. Initiate a letter of appeal which states the full facts, circumstances, date of the disciplinary being appealed, basis of appeal, name, race, sex, and

date of birth.  The letter should be sent to the
                    Sheriff.
                    2.    The Sheriff will review the disciplinary and
                    prepare  his/her  comments  or  recommendations  by
                    separate letter.
                    3.    The Sheriff will review all appeals and render a
                    decision.  All decisions made by the Sheriff are final
                    and without further recourse.

(Doc. 24-4 at 4)(emphasis added).

     Plaintiff   contends   that,   based   on   the   available

administrative remedies laid out in the Inmate Handbook, he

properly exhausted his claims.  (Doc. 73 at 11).  Specifically,

he "contacted a correction officer" and requested to "see the

doctor" (to whom he made complaints about his vision) and signed

the Inmate Request Form.  (Id.).  To the extent any grievance or

appeal was required, the Inmate Handbook fails to address the

proper administrative policy.

     The undersigned agrees that the administrative remedy and

grievance policy contained in the Inmate Handbook fails to

identify with specificity the actions an inmate is to take to

assert a grievance or appeal for a medical issue.  Thus,

Defendants have failed to prove that an administrative remedy

existed beyond the filing of an Inmate Request Form, and

Plaintiff has established that further administrative remedies

were unavailable to him.  Turner v. Burnside, 541 F.3d 11077,

1083 (11th Cir. 2008)(Defendants bear the burden of proving that

the plaintiff has failed to exhaust his available administrative

remedies.); see also Jones v. Bock, 549 U.S. 199, 216, 127 S. Ct. 910, 921, 166 L. Ed. 2d 798 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."); Dixon v. United States, 548 U.S. 1, 8, 126 S. Ct. 2437, 2443, 165 L. Ed. 2d 299 (2006) (stating that, as a "general evidentiary rule," the burdens of production and persuasion are given to the same party). As such, the undersigned finds Steele is not barred by § 1997e(a) for failing to exhaust his administrative remedies.

Accordingly, the undersigned concludes that Plaintiff Best is not barred for failing to exhaust his claims against Defendants as required by 42 U.S.C. § 1997e(a), and Defendants are not entitled to summary judgment on Plaintiff Best's claims against them.

**B. Statute of Limitations.**

Defendants next assert that any complaint Plaintiff made prior to December 19, 2014 is barred by the two-year limitation period applicable to 42 U.S.C. § 1983 suits and is due to be dismissed. (Doc. 24 at 11-12).

> The statute of limitations for claims brought pursuant to § 1983 is determined by the appropriate state statute of limitations governing personal injury claims. Crowe v. Donald, 528 F.3d 1290, 1292 (11th Cir. 2008); Chappell v. Rich, 340 F.3d 1279, 1283 (11th Cir. 2003). In Alabama, "that limitations period is two years." Powell v. Thomas, 643 F.3d 1300, 1303 (11th

Cir. 2011) (citing Jones v. Preuit & Mauldin, 876 F.2d
1480, 1483 (11th Cir. 1989) ("The two-year limitations
period . . . applies to section 1983 actions in
Alabama.") (internal alterations omitted)); Ala. Code
§ 6-2-38(l).

The question of when a § 1983 action accrues is
governed by federal law. Parrish v. City of Opp, Ala.,
898 F. Supp. 839, 842 (M.D. Ala. 1995) (citing
Mullinax v. McElhenney, 817 F.2d 711, 716 (11th Cir.
1987)). In § 1983 cases, "'the statute [of limitations]
does not begin to run until the facts which would
support a cause of action are apparent to a person
with a reasonably prudent regard for his rights.'"
Calhoun v. Ala. Alcoholic Bev. Control Bd., 705 F.2d
422, 425 (11th Cir. 1983) (quoting Reeb v. Economic
Opp. Atlanta, Inc., 516 F.2d 924, 930 (11th Cir.
1983)). Therefore, § 1983 cases "do not accrue until
the plaintiff knows or has reason to know that he has
been injured." Mullinax, 817 F.2d at 716. "Nor will a
Section 1983 action accrue until the plaintiff is
aware or should have been aware who has inflicted the
injury." Id.

Hutchinson v. Cunningham, 2:17-cv-185-WKW-GMB, 2018 U.S. Dist.

LEXIS 11509, *23-24 (M.D. Ala. Jan. 23, 2018).

According to Defendants, Plaintiff filed this action on

December 19, 2016; thus, any claims occurring before December 19,

2014 are barred. (Doc. 24 at 12). Plaintiff asserts, and the

undersigned agrees, that the statute of limitations does not

begin to run until the facts that would support a cause of

action are apparent to the plaintiff. Calhoun, 705 F.2d at 425.

The record is clear that despite complaints of vision loss,

Plaintiff was unaware of the cause of his vision loss and

unaware of a diagnosis or prognosis related to his vision until

February 12, 2015, when examined by Dr. Wyatt and diagnosed with end stage proliferative diabetic retinopathy. (Doc. 73 at 7). Consequently, the accrual date for the statute of limitations for any and all of Plaintiff's claims cannot be prior to February 12, 2015. Therefore, the undersigned determines that Plaintiff's complaint is timely and not barred by the statute of limitations.

### C. Immunity Defenses.

Defendants Dallas County, Alabama, Sheriff Huffman and Warden Brown argue that any/all of the federal claims asserted by Plaintiff in the defendants' official capacities are due to be dismissed based on Eleventh Amendment Immunity. (Doc. 55). Defendants Sheriff Huffman, Warden Brown, and Dr. Davis further assert that they are entitled to qualified immunity with respect to the claims asserted against them in their individual capacities. In addition to the claims brought under federal law, Plaintiff Best asserts claims against Dallas County and Sheriff Huffman that arise under Alabama law, to which Defendants claim the defense of sovereign and state agent immunity.

### 1. Eleventh Amendment Immunity.

Plaintiff's action against Sheriff Huffman and Warden Brown in their official capacities, in reality, imposes liability on the entity each represents, not on the individuals. <u>Brandon v. Holt</u>, 469 U.S. 464, 471-72, 105 S. Ct. 873, 877-78, 83 L.Ed.2d

878 (1985). The determination of the entity represented by Sheriff Huffman and Warden Brown for purposes of determining immunity from suit under 42 U.S.C. § 1983 is determined by reference to state law. Carr v. City of Florence, 916 F.2d 1521, 1525 (11th Cir. 1990). Alabama law holds that a sheriff is a state, rather than a county, official for purposes of immunity from suit. Parker v. Amerson, 519 So.2d 442 (Ala. 1987); see also Taylor v. Adams, 221 F.3d 1254, 1256 (11th Cir. 2000) ("Alabama sheriffs operating jails are state officers protected by Eleventh Amendment immunity."). Similarly, "employees of the sheriff, deputies [and officers] in their official capacities, are [] entitled to Eleventh Amendment immunity." Scruggs v. Lee, 256 F. App'x 229, 232 (11th Cir. 2007); Lancaster v. Monroe Cnty., 116 F.3d 1419, 1429 (11th Cir. 1997) ("[J]ailers are state officials for the purpose of Eleventh Amendment immunity."). There is no dispute that Defendants Huffman and Brown, in their official capacities as sheriff and warden, are arms of the state for Eleventh Amendment Immunity purposes and are therefore barred from suit for monetary damages in this action.[5]

---

[5] The Supreme Court has recognized two ways that a private person can sue a state for damages: either (1) Congress can abrogate sovereign immunity by enacting legislation to enforce the substantive provisions of the Fourteenth Amendment, or (2) a state can waive its sovereign immunity. *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670,

As to Defendant Dallas County, Alabama, Plaintiff claims that the county, as the employer of Sheriff Huffman and Warden Brown and as the entity who oversees the Dallas Jail, is liable for the denial or delay of medical treatment alleged in his Complaint. (Doc. 6 at -5-6). In the landmark case of Monell v. Dep't. of Soc. Servs., 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978), the United States Supreme Court found that municipalities -- a term which encompasses counties -- are subject to suits for damages under § 1983.[6] In making this finding, the Court held that municipalities are not entitled to Eleventh Amendment immunity or qualified immunity. See Owen v. City of Independence, 445 U.S. 622, 63 L. Ed. 2d 673, 100 S. Ct. 1398 (1980). Qualifying its holding somewhat, the Supreme Court made clear that a county may not be held liable for a § 1983 violation however unless the county has a policy or custom which caused the constitutional deprivation: "it is when execution of a government's policy or custom, whether made by its lawmakers

119 S.Ct. 2219, 2223, 144 L.Ed.2d 605 (1999). Plaintiff does not assert that Congress has abrogated sovereign immunity with regard to her claims. Nevertheless, in *Quern v. Jordan*, 440 U.S. 332, 341, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979), the Court concluded that Congress, in passing § 1983, did not intend to override the immunity guaranteed to the states by the Eleventh Amendment. *See also Robinson v. Georgia Dep't of Transp.*, 966 F.2d 637, 640 (11th Cir. 1992) ("Congress, in passing § 1983, did not intend to override the immunity guaranteed to the states by the Eleventh Amendment").
[6]    Municipalities, however, are not subject to claims for punitive damages. See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271, 69 L. Ed. 2d 616, 101 S. Ct. 2748 (1981).

or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." <u>Monell</u>, 436 U.S. at 694.[7] Accordingly, for § 1983 liability to attach in this case, there must be a causal connection between the county's responsibilities and the injury suffered by Plaintiff. <u>See id</u>. at 690. The causation requirement is met if the municipal policy is the moving force of the constitutional violation. <u>See id</u>. at 694. In assessing whether a county can be liable under § 1983, "[a] court's task is to 'identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'" <u>McMillian v. Monroe Cnty.</u>, 520 U.S. 781, 138 L. Ed. 2d 1, 117 S. Ct. 1734, 1736 (1997) (quoting <u>Jett v. Dallas Ind. Sch. Dist</u>., 491 U.S. 701, 737, 105 L. Ed. 2d 598,

---

[7]    A well-recognized corollary is that a county cannot be held vicariously liable for the acts of its employees. <u>See</u> <u>Monell</u>, 436 U.S. at 691. For liability to attach to a county, the county must have had a policy or custom which resulted in usurpation of a person's constitutional rights. Thus, even if the sheriff and the jailers could be seen as employees of the county rather than the state, the county would not be liable under a pure theory of respondeat superior for any wrongful acts committed by members of the Sheriff's Department. <u>Cf. Pembaur v. Cincinnati</u>, 475 U.S. 469, 478, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1986) (noting that a local governmental unit cannot be found liable under § 1983 "by application of the doctrine of respondeat superior.").

109 S. Ct. 2702 (1989)).  Courts are to look to state law to determine who is a policymaker with respect to a particular action or decision.  See Jett, 491 U.S. at 737 (superseded by statute on other grounds).

As previously discussed, Alabama law defines a county sheriff as a state officer rather than a county officer or employee.[8]  See Ala. CONST. Art. V, § 112 (listing county sheriffs as members of the state's executive department); see also Parker v. Amerson, 519 So. 2d 442 (Ala. 1987) ("A sheriff is an executive officer of the State of Alabama[.]").  Because of this fact, there is an issue as to whether an Alabama sheriff can ever be said to be a county policymaker for the county where he works.  The determination of whether an official is a final policymaker for a division of government generally depends on the particular area or issue under consideration.  See McMillian, 117 S. Ct. at 1737 ("Our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue.").  For § 1983 liability to attach to a county, the policy at issue must have

_____

[8]    Again, the same is true for sheriffs' deputies and jailers.  Alabama courts have repeatedly held that a deputy is a state officer who is entitled to the same immunities enjoyed by a sheriff.  See, e.g., Alexander v. Hatfield, 652 So. 2d 1142 (Ala. 1994) (holding that deputies have the same immunities as sheriffs because a deputy is but a legal extension of the sheriff - - his acts are the acts of the sheriff).

been made by a person who exercises final authority *on behalf of* the county with respect to that policy. See <u>McMillian</u>, 117 S. Ct. at 1736. Alabama law, however, clearly demonstrates that sheriffs possess only state policymaking authority when running the day-to-day affairs of a jail "and are not county policymakers in their daily management of county jails.". See <u>Turquitt</u>, 137 F.3d at 1291-92. Additionally, Plaintiff fails to identify any policy or custom of Dallas County (or the other defendants) which led to his alleged injury. Accordingly, Dallas County cannot be held liable for Sheriff Huffman's and Warden Brown's alleged constitutional violations or for the decisions regarding Plaintiff's medical treatment. Therefore, Defendants' summary judgment motion is due to be granted in part, insofar as it pertains to the plaintiff's federal claims against Dallas County, Alabama.

### 2. Qualified Immunity.

Defendants further assert the defense of qualified immunity as a bar from suit against them in their individual capacities. (Doc. 55, 67).

Qualified immunity offers complete protection for individual government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L.Ed.2d 565 (2009). A party is eligible to claim qualified immunity if he was acting within the line and scope of his employment. <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1264 (11th Cir. 2004). In his Response, Plaintiff contends the defendants are not entitled to qualified immunity because they were not acting within the scope of their discretionary authority at the time they denied or delayed him medical treatment and further asserts that the defendants would need to show they were "licensed medical professions" to be claim the immunity defense. (Doc. 73 at 25). Conversely, in his Complaint and Response, Plaintiff insists that the defendants bear the responsibility, as supervisors and maintainers of the Dallas County Jail, to provide him with needed medical treatment while incarcerated at the jail. (<u>Id</u>.). Based on the record, clearly the defendants were acting within their discretionary authority at the time the complaint arose. Thus, the burden shifts to the plaintiff to establish that

qualified immunity is inappropriate. Lee v. Ferraro, 254 F.3d 1188, 1194 (11th Cir. 2002).

The Supreme Court has mandated a two-step analysis for resolving qualified immunity claims. Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). First, a court must decide whether the facts that a plaintiff has alleged "show the [defendant's] conduct violated a constitutional right." Id. Second, the court must decide "whether the right was clearly established." Id. The determination of these elements may be conducted in any order. Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Therefore, the Court will proceed with its analysis of whether or not Plaintiff has successfully alleged a constitutional violation.

### 3. State Law Immunity.

Plaintiff alleges that Dallas County and Sheriff Huffman are liable for the acts of Warden Brown and Dr. Davis[9] due to the

---

[9]     Any attempt by Plaintiff to name additional defendants to this action by identifying fictitious parties "A, B, C" and "Y and Z" in his amended complaint fails. (See Doc. 46 at 2-3).
     As a general rule, fictitious party pleading is not allowed in federal court. See Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010) ("as a general matter, fictitious-party pleading is not permitted in federal court."). The limited exception to this rule is when the plaintiff's description of the defendant is so specific as to be "at the very worst,

negligent hiring, training, and supervising of the defendants. (Doc. 46 at 2). According to Plaintiff, Defendants Dallas County and Sheriff Huffman knew or should have known that Defendants Brown and Davis were incompetent and, thus, Defendants Dallas County's and Sheriff Huffman's negligence and/or wantonness caused or allowed Plaintiff's medical condition to worsen until he became blind. (Id.).

In accordance with Article I § 14 of the Alabama Constitution, which states "the State of Alabama shall never be made a defendant in any court of law or equity", Alabama courts have routinely held that sheriffs and their deputies are executive officers of the State who are absolutely immune from suit on state-law claims, see Tinney v. Shores, 77 F.3d 378, 383 (11th Cir. 1996), with the exception to immunity being actions brought to enjoin the sheriff's conduct. Id. at 1143. In the action at hand, Plaintiff is suing for damages; thus Defendant Sheriff Huffman is immune from the state law claims asserted against him. See McMillian v. Johnson, 101 F.3d 1363, 1365 (11th Cir. 1996) ("a claim against an Alabama sheriff in his

surplusage." Dean v. Barber, 951 F.2d 1210, 1215-16 (11th Cir. 1992). Plaintiff's complaint however is void of details or descriptions of the proposed defendants "A", "B", "C", "D", "Y", or "Z", their conduct, dates and times, or any sufficient facts to identify the unnamed parties. Therefore, Plaintiff's fictitious defendants will not be considered parties to this action.

individual capacity is barred by the doctrine of sovereign immunity," even if such claim is based on malicious or intentional wrongdoing); *Cobb v. Marshall,* 481 F. Supp.2d 1248, 1261 (M.D. Ala. 2007) (holding that, where an Alabama sheriff is sued for money damages in his individual capacity for state-law claims, that defendant is fully shielded from liability by § 14 immunity); *Anderson v. Greene,* 2005 U.S. Dist. LEXIS 38684, 2005 WL 1971116, *9 (S.D. Ala. Aug. 16, 2005) (observing that binding authorities interpret Alabama law as declaring that "sheriffs and their deputies are absolutely immune from state law claims in their individual and official capacities, even if they are sued for actions that are malicious, intentional or otherwise outside the scope of their authority"). Likewise, to the extent Plaintiff attempts to assert supervisory claims against Warden Brown for alleged negligent actions of subordinates, Warden Brown partakes of this state immunity as well. "Because sheriffs are constitutional officers and because deputy sheriffs act on behalf of sheriffs as alter egos, a claim for monetary damages made against a deputy sheriff in his or her individual capacity is barred by the doctrine of State immunity whenever the acts that form the basis of the alleged liability were being performed within the line and scope of the deputy sheriff's employment." Ex parte Donaldson, 80 So. 3d 895, 899 (Ala. 2011).

As to Defendant Dallas County, under Alabama law, a county is responsible for only the erection and maintenance of the county jail. See Ala. Code § 11-14-10 (1975). It is the sheriff who is responsible for the care of inmates and in charge of the jail. King v. Colbert Cnty., 620 So. 2d 623, 625-26 (Ala. 1993). Furthermore, as discussed above, Alabama sheriffs and their deputies are not considered employees of the county for purposes of imposing liability on the county. Id. Thus, Dallas County has no responsibility in regard to the training or hiring of the members of the sheriff department and cannot be held liable for the vicarious acts of the sheriff or deputies in operating the jail. Vinson v. Clarke Cnty., Ala., 10 F. Supp. 2d 1282, 1303 (S.D. Ala. 1998) ("[I]t is not possible for an Alabama county to act negligently or wantonly in regard to the oversight of inmates in the jail."); see also, Turquitt v. Jefferson Cnty., 137 F.3d 1285, 1290 (11th Cir. 1998) ("Where a duty is specifically placed upon the sheriff, that duty is 'statutorily reserved' for the sheriff, and the county has no liability for the sheriff's failure to perform it."). Consequently, Defendant Dallas County is immune from suit on all claims asserted against it in this action.

   D.   **Eighth Amendment Violation.**

   The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and

unusual punishments inflicted." U.S. Const. Amend. VIII. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

Sims, 25 F.3d at 983 (citing Hudson v. McMillian, 503 U.S. 1, 8, 112 S. Ct. 995, 999, 117 L. Ed. 2d (1992)). To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in

part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 n. 9 (2002)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need. Farrow, 320 F.3d at 1243. "Deliberate indifference" entails more than mere negligence. Estelle, 429 U.S. at 106; Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in Farmer by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting Farmer and Estelle, this Court explained in McElligott that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott, 182 F.3d at 1255; Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

Farrow, 320 F.3d at 1245-46.

"Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." Hill, 40 F.3d at 1187 (internal citations and quotation marks omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." Id.

> The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious." An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

Hill, 40 F.3d at 1188-89 (internal citations omitted) (footnotes omitted).

For purposes of this motion, the Court assumes without deciding, that the chronic condition of diabetes is a serious medical need which requires treatment.

### 1. **Denial of Free World Medication.**

The record confirms that at the time Plaintiff was booked into the Dallas Jail, he was prescribed and taking the medication Invokana to treat his diabetic condition. (Doc. 24-5 at 2). According to Plaintiff, however, the jail refused to fill the prescription for Invokana because "it was too expensive" and further failed to provide him with an alternative diabetic medication. (Doc. 30 at 2; Doc. 43 at 1). Plaintiff alleges the defendants acted with deliberate indifference in denying him diabetic medication.

The Eighth Amendment requires the government to "provide medical care for those whom it is punishing by incarceration." Estelle, 429 U.S. at 103. It does not, however, provide inmates a right to any particular or specific type of medical treatment, including procedures or medications. Id. at 103-106. While courts have consistently found that differences of opinion between an inmate and the prison medical staff over the specific treatment or medication to be provided does not constitute cruel and unusual punishment, see Estelle, 429 U.S. 97 at 106; Trotter v. Correctional Medical Services, Inc., 2008 WL 2225696 at *9, 2008 U.S. Dist. LEXIS 109725 at *24 (S.D. Ala. May 29, 2008) ("It is well-established that a difference in opinion or a disagreement between an inmate and prison officials as to what medical care is appropriate for his particular condition does

not state a claim for deliberate indifference to medical needs."); Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980) (noting that a difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation), cert. denied, 450 U.S. 1041, 101 S. Ct. 1759, 68 L. Ed. 2d 239 (1981), grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment may. See McElligott v. Foley, 182 F.3d 1248 (11th Cir. 1999).

In the case at hand, Plaintiff does not merely allege that he was denied a specific medication, rather he claims Defendants denied him his free world prescription medication *and* failed to substitute the diabetic prescription leaving him without any prescription treatment for his chronic diabetes. A review of the record confirms that Plaintiff indicated (on the Medical Screening form) upon booking into the jail that he suffered from diabetes, heart trouble, and high blood pressure, that he was under the current medical care of Dr. Bohannon, and that he was currently taking the prescription medication Invokana to treat his diabetic condition. (Doc. 24-5 at 2-3). The record is otherwise extremely vague, if not void, of information related to Plaintiff's diabetic prescription treatment. Notably, there are two discharge records (dated July 28, 2014 and May 12, 2015) which indicate by a doctor's notation that Plaintiff was

currently prescribed and taking Metformin to control his blood sugar prior to being hospitalized and was discharged with a Metformin prescription. Otherwise, however, the record is void of documentation from the jail of any pill distributions, pharmacy receipts, or doctor's prescriptions or orders to evidence that Plaintiff *received* the prescribed medication to treat his diabetic condition while incarcerated at the Dallas Jail. Furthermore, Defendants have failed to address this issue in any of their pleadings. (See Doc. 24-5 at 4-5, 20-21).

Given Defendants' failure to establish that Plaintiff either did not require or received diabetic medication, the undersigned determines that Plaintiff has carried his burden of showing that a genuine issue of material fact remains as to whether or not Defendants denied him needed diabetic medication and Defendants Huffman, Brown, and Davis are not entitled to summary judgment on this claim at this time.

## 2. Denial or Delay of Medical Care.

Plaintiff Best further alleges that Defendants denied and/or delayed him medical treatment for his complaints of loss of vision while incarcerated at Dallas Jail.[10] To establish his

---

[10]    Plaintiff's claim arises while he was housed at Dallas Jail, both as a pretrial detainee and convicted prisoner; thus, his claims are governed by both the Fourteenth and Eighth Amendments.    See Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996) ("Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth

constitutional claim Plaintiff must show that Defendants acted wantonly, with deliberate indifference to his serious medical needs, see Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); Wilson v. Seiter, 501 U.S. 294, 298-99, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991); Lancaster v. Monroe Cnty., 116 F.3d 1419, 1425 (11th Cir. 1997) – that is that the medical treatment he received was so grossly inadequate "as to amount to no care at all." McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999) ("A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness."); Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause.").

In denying the allegations of deliberate indifference to Plaintiff's loss of vision, Defendants Sheriff Huffman and

---

Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners."). "However, the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees." Id.

Warden Brown assert that Plaintiff was examined multiple times by Dr. Davis during his incarceration at the Dallas Jail and that the doctor's instructions were followed. (Doc. 24 at 7). Defendants further reference Plaintiff's multiple examinations by retinal specialists and the surgeries obtained while incarcerated at the Dallas Jail as evidence of the proper medical treatment Plaintiff received. (Id. at 8-10). Likewise, Defendant Dr. Davis affirms that upon knowledge of Plaintiff's vision loss he notified Warden Brown and informed the Warden that Plaintiff required an examination with an eye-care specialist. (Doc. 66-1 at 4). Dr. Davis further affirms that he has no role in scheduling appointments or surgeries or in transportation arrangements for the appointments. (Id.). Lastly, he denies communication with any of the eye care specialists regarding Plaintiff's condition. (Id.).

Turning to the record before the Court, it appears that Plaintiff first complained of vision loss on June 10, 2014 (although he was previously examined on April 9, May 15, and May 29 of 2014) and further complained of trouble regulating his blood sugar due to the food served at the jail. (Doc. 24 at 7; Doc. 24-5 at 2-3). In response to Plaintiff's complaints, Defendant Dr. Davis ordered Plaintiff be provided an eye exam and double portion meals. (Doc. 43 at 1-2). Plaintiff alleges Dr. Davis' orders were not followed and only after his defense

counsel intervened was he temporarily (for approximately two weeks) provided double portion meals. (Id.).

On June 26, 2014, Plaintiff was again examined by Dr. Davis for complaints of vision loss, and Plaintiff contends that Defendant Dr. Davis instructed the officers present (Mrs. Billups and Sergeant King) that Plaintiff needed an eye examination, and Dr. Davis assured Plaintiff he would personally speak to Warden Brown about obtaining an eye appointment as well. (Doc. 72 at 2; Doc. 6 at 4).

Between July 26, 2014 and January 15, 2015, Plaintiff was examined by Dr. Davis no less than twelve (12) times and treated at a local hospital for a foot infection. (Doc. 24 at 7, Doc. 24-5 at 4-5, 44-47). Plaintiff claims he reported a sudden decrease in vision to Dr. Davis on August 14, 2014, and Dr. Davis told Plaintiff that he had informed Warden Brown of Plaintiff's need for an eye exam but insisted he would do so again. (Doc. 73 at 3). Additionally, Plaintiff alleges that on October 17, 2014, Mr. Goree (from Cahaba Mental Health) faxed Warden Brown an application for procuring an eye exam for Plaintiff through the Selma Lion's Club, but Plaintiff claims Warden Brown failed to obtain the application until November 16, 2014, essentially a month later. (Id.).

Plaintiff received his first eye exam (through the assistance of the Selma Lion's Club) on February 12, 2015, where

Plaintiff was diagnosed with End Stage Proliferative Diabetic Retinopathy in both eyes. (Doc. 24-5 at 6). Defendants were informed by Dr. Brendan Wyatt that Plaintiff needed "surgery and laser treatment in both eyes within the next few weeks by a Retina Specialist or he may be permanently and irreversibly blind." (Id.). Dr. Wyatt further informed Defendants that Plaintiff's diabetic condition was "advanced and 50% of all patients with [Plaintiff's] level of eye disease are dead within 5 years from a stroke or heart attack. For this reason [Plaintiff] need[ed] close medical observation and diabetic foot care." (Id.). According to Plaintiff, Defendant Warden Brown transported Plaintiff to this eye exam and witnessed the diagnosis. (Doc. 73 at 4).

Dr. Wyatt scheduled Plaintiff an appointment with retina specialist Dr. Matt Sepp, in Birmingham, Alabama, for March 2, 2015. (Doc. 24-5 at 7). Dr. Sepp examined Plaintiff on March 2, 2015 and scheduled him for eye surgery on March 12, 2015. (Doc. 24 at 9). The parties dispute whether surgery was performed on March 12, 2015.[11]

---

[11] Defendants claim that Plaintiff received the eye surgery on March 12, 2015 and was referred thereafter to a Montgomery group for treatment per Dr. Sepp. (Doc. 24 at 9). The record before the Court is completely void however of any medical charts, notes, or documentation to support that the surgery was performed, and Plaintiff denies that he received the scheduled surgery on March 12. (Doc. 72 at 4).

On April 2, 2015, Plaintiff was examined by Dr. Parma, a retina specialist, in Montgomery, Alabama. (Doc. 24-5 at 9). Dr. Parma diagnosed Plaintiff with severe retinal detachment and scarring in both eyes. (Doc. 41 at 6). He stated that Plaintiff was "in bad shape" and opined that even with surgery he "may be legally blind." (Id.). Dr. Parma prescribed surgical intervention "as soon as we can do it" and noted doing the surgery the next day (operating on Friday and seeing him post operatively on Saturday). (Id.). In discussing the needed surgery with Plaintiff, Dr. Parma stated:

> I want to start with OD based on how you do we will work with OS. I can't work with the past all I can do is deal with what is going on. I can't comment on what has happened in the past. I didn't see your eyes then. I can only deal with what is going on right now. I will fight to get you as good as you can. Or problems can worsen quickly with time. [Diabetic Retinopathy] is a long term problem and the damage is already done. . . . no question you need surgery.

(Doc. 41 at 4). According to Plaintiff, Lieutenant Woods (the transportation officer who was present at the exam) informed Dr. Parma:

> that there was a process of approval [for scheduling surgeries] wherein Dr. Parma's office would have to call [Warden] Brown, who would have to call [Sheriff] Huffman, who would have to get funding through the county. Dr. Parma stated, if surgery could not be performed the next day, it would need to be done the following Tuesday, April 8, 2015.

(Doc. 72 at 4-5). Consequently, the surgery was scheduled for April 8, 2015, but it was not performed until April 14, 2015 due

to a transportation issue. (Doc. 24 at 9; Doc. 24-5 at 11).

Plaintiff's next surgery was scheduled with Dr. Parma for May 6, 2015; however, the surgery was not performed until May 13, 2015. (Doc. 24 at 9; Doc. 24-5 at 21).

Plaintiff was transferred from Dallas Jail on June 10, 2015. (Doc. 72 at 1).

Generally, "[w]hen a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation," Waldrop, 871 F.2d at 1035, and clearly the record shows that Plaintiff received medical care while at the Dallas Jail - every request to see Dr. Davis was obliged, referrals to specialists were granted, and surgeries were performed. However, the record in this action is replete of specialists indicating the urgency for eye care for Plaintiff, a diabetic patient complaining of vision loss, and yet multiple appointments and surgeries appear to be delayed for reasons unknown or disputed at this time.

The record evidences that it took approximately eight (8) months from Plaintiff's first complaint of vision loss to obtain an eye exam, despite being a known diabetic inmate and having been seen by Dr. Davis approximately twelve (12) times in those months. Once end stage proliferative diabetic retinopathy was confirmed by Dr. Wyatt, there could be no confusion as to the seriousness of Plaintiff's vision loss. In fact, Dr. Wyatt was very direct in communicating the urgency of the situation and

consequences of failing to obtain surgery quickly. Still, two subsequent retinal surgeries were postponed and one scheduled surgery was arguably missed completely.

Defendants maintain that Plaintiff was regularly seen by Dr. Davis and due to vision complaints was taken to Dr. Wyatt for an eye exam. (Doc. 24 at 8). Any perceived delay in receipt of surgery was caused by normal scheduling complications Dr. Wyatt's office encountered when booking an appointment with a retinal specialist. (Id.). Defendants further assert retinal surgery was performed on March 12, 2015 and that the missed May 6, 2015 surgery was because Plaintiff failed to follow the fasting instructions required for surgery. (Id. 8-9).

Conversely, Plaintiff affirms he missed two surgical appointments and five doctors' visits while at the Dallas Jail. (Doc. 30 at 1). He disputes Defendants' claim that he received surgery on March 12, 2015, asserting that the transportation officer was ordered to take another inmate to Mobile, Alabama and was not available to drive Plaintiff to his surgical appointment. (Doc. 30 at 2). Also, Plaintiff explains that the missed May 6, 2015 surgery was not due to his failure to follow fasting instruction but was instead due to the failure of jail staff to inform him of surgical instructions and the need to not eat breakfast. (Id.).

The law is clear, mere delays in receipt of medical care do not rise to a constitutional violation. Cf., Shapley v. Nevada Bd. of State Prison Comm'rs., 766 F.2d 404, 407 (9th Cir. 1985) (noting that where there is a "'mere delay in surgery,' a prisoner can make 'no claim for deliberate medical indifference unless the denial was harmful.'") (citation omitted). However, delays in medical treatment for non-medical reasons, Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) ("A defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference."), and delays which worsen a medical condition may establish a constitutional violation. Hill v. Dekalb Reg'l Youth Ctr., 40 F.3d 1176, 1188-89 (11th Cir. 1994). In this action, Plaintiff affirms that he is now permanently blind due to the delay in receiving retinal surgery. The record also supports the known urgency and need for surgical intervention to prevent worsening of Plaintiff's condition and blindness. However, the record is unclear about the reason for the delays and the exact care that Plaintiff received while waiting for retinal surgery. For instance, the few submitted chart notes of Dr. Davis are illegible; the record as it stands contains virtually no exam notes from the specialists; there are no surgical notes; there are no transportation documents; there are no pill call or distribution records. Taking Plaintiff's allegations as true, as it must at this stage, the undersigned

finds Plaintiff has carried his burden of showing the existence
of a factual dispute and Defendants Huffman, Brown, and Davis
are not entitled to summary judgment at this time on the
deliberate indifference claim asserted against them in their
individual capacities.

   **E.   Americans with Disabilities Act.**

   In conjunction with the deliberate indifference claims,
Plaintiff asserts that Defendants are liable for violations of
the Americans with Disabilities Act ("ADA"). (Doc. 64 at 1).
Under Title II of the ADA, public entities may not discriminate
against disabled persons – this applies to inmates at state
correctional facilities.  United States v. Georgia, 546 U.S.
151, 154, 126 S. Ct. 877, 163 L. Ed. 2d 650 (2006) (citing
Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 210, 118 S.
Ct. 1952, 141 L. Ed. 2d 215 (1998)).  However, Title II does not
provide for individual liability.   See Badillo v. Thorpe, 158
F. App'x 208, 211 (11th Cir. 2005) (relying on Garcia v.
S.U.N.Y. Health Scis. Ctr. Of Brooklyn, 280 F.3d 98, 107 (2nd
Cir. 2001)).   Consequently, Defendants are due to be granted
summary judgment on the ADA claim against them in their
individual capacities. However, "in so far as Title II creates
a private cause of action for damages against the States for
conduct that *actually* violates the Fourteenth Amendment, Title
II validly abrogates state sovereign immunity." Georgia, 546

U.S. at 159. Accordingly, the Court considers whether Plaintiff has asserted a viable ADA claim.

The ADA states: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "qualified individual" is defined by the ADA as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and service, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 1231(2).

Assuming diabetes is recognized as a disability per the ADA as Plaintiff contends, Plaintiff must show that he was denied services based on his status as a diabetic inmate. Plaintiff asserts that:

> the record bears no evidence any diagnostic or laboratory tests, which are guaranteed to inmates [were] performed at intake to evaluate his need for the diabetic medication prescribed by his primary physician, which was denied while other medications were continued, wherefore Plaintiff contends it was denied solely on the basis of being a diabetic medication for advanced diabetes. Further, whereas Plaintiff was unduly delayed in being [provided] an

eye exam, which exam is a reasonable accommodation under the ADA. . . . Plaintiff should have received notice of his rights under the ADA pursuant to 28 CFR § 35.106, received an A1C test to determine his need for medications and a prompt eye exam upon his complaints about his vision. While the Plaintiff did not receive these specific services, but was provided other medications, and also had other routine tests such as blood pressure checks and other medical services including treatment at a local hospital for an infection in his foot. Wherefore, there appears to be no basis for refusal of the service denied except . . . [they] are related to diabetes.

(Doc. 73 at 20-21). As previously discussed, the question remains in this action as to whether Plaintiff received proper medical care for his diabetic symptoms; however, a claim for negligent or inadequate medical treatment is not actionable pursuant to the ADA. Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996). Instead, Plaintiff must show that he was intentionally treated differently from other inmates because of his disability. See Farley v. Nationwide Mutual Ins. Co., 197 F.3d 1322, 1334 (11th Cir. 1999) (plaintiff must present evidence the disability constituted a determinative factor in the decision-making process); McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1077 (11th Cir. 1996). The record, however, contradicts many of the reasoned examples put forth by Plaintiff. Namely, Plaintiff alleges in other pleadings that he was denied the diabetes prescription Invokana because it was too expensive, not solely because it was a diabetic medication. (Doc. 30 at 2; doc. 43 at 1). The record further evidences that

Plaintiff, arguably, was provided Metformin for his diabetic condition while incarcerated at the jail. (Doc. 24-5 at 5, 21). Plaintiff also confirms that he was provided a double portion food profile to meet his dietary needs.[12] While it is disputed if Plaintiff was in fact delayed/denied medical treatment, the record lacks evidence to show that any possible denial or delay in medical treatment was because Plaintiff was a diabetic inmate (versus an inmate suffering with a different chronic disease). Plaintiff's failure to provide sufficient evidence or allegations that he was excluded from a service, program, or activity or that the denial was the result of intentional discrimination based on his "disability" is detrimental to asserting a claim under Title II of the ADA. For these reasons, Defendants are entitled to summary judgment on Plaintiff's ADA claim.

**F.  Equal Protection.**

Plaintiff claims that Defendants' failure to provide proper medical care violated his equal protection rights under the Fourteenth Amendment. (Doc. 64 at 1).

"Equal-protection claims generally concern governmental classification and treatment that impacts an identifiable group of people differently than another group of people.  Foley v.

---

[12]   Although Plaintiff explains that the double portion food profile was only temporary, he fails to allege that he ever subsequently requested or sought it.

Orange Cnty., 638 F. App'x. 941, 944 (11th Cir. Jan. 29, 2016).

To establish a claim under the Equal Protection Clause, an

inmate "must demonstrate that (1) he is similarly situated to

other prisoners who received more favorable treatment; and (2)

the state engaged in invidious discrimination against him based

on race, religion, national origin, or some other

constitutionally protected basis." Sweet v. Sec'y, Dep't. of

Corrs., 467 F.3d 1311, 1318-1319 (11th Cir. 2006) (citing *Jones*

*v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001). Plaintiff must

also go beyond conclusory allegations or assertions of personal

beliefs of discrimination. GJR Invs. V. Cnty. of Escambia,

Fla., 132 F.3d 1359, 1368(11th Cir. 1998) (The lack of any

allegations in the complaint . . .tending to show a purposeful

discrimination . . . is not supplied by the opprobrious epithets

"willful" and "malicious" . . ., or by characterizing [the

defendant's actions] as an unequal, unjust, and oppressive

administration of the laws…. These epithets disclose nothing as

to the purpose or consequence of [the defendant's actions]….

Such allegations are insufficient under our decisions to raise

any issue of equal protection of the laws . . . .") (citing

Snowden v. Hughes, 321 U.S. 1, 10, 64 S. ct. 401, 88 L. Ed. 497

(1944)). "Where no fundamental right or suspect class is

implicated, courts evaluate equal protection claims under the

rational basis test." Morrissey v. United States, 871 F.3d

1260, 1268 (11th Cir. 2017); City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 439-40, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985) (In the absence of government classifications based on race, alienage, national origin, or gender, a classification will be presumed valid so long as it is rationally related to a legitimate state interest.). "To establish an equal protection clause violation, a plaintiff must demonstrate that a challenged action was motivated by an intent to discriminate." Elston v. Talladega County Board of Education, 997 F.2d 1394, 1406 (11th Cir. 1993); see also Cross v. State of Alabama, 49 F.3d 1490, 1507 (11th Cir. 1995) (to establish an Equal Protection Clause violation, plaintiff must prove discriminatory motive or purpose); Smith v. State of Georgia, 684 F.2d 729, 736 (11th Cir. 1982)(equal protection claim requires showing of purposeful discrimination).

Plaintiff fails to allege any factual basis for inferring that he was discriminated against because of a constitutionally suspect classification, such as race, religion, or national origin. Instead, Plaintiff argues that Dallas Jail policy dictates that "inmates are guaranteed access . . . to treatment services as directed by the medical professionals" but he, as a diabetic inmate, was denied certain diabetic treatments. (Doc. 73 at 19). This, however, does not establish that he was similarly situated with other pre-trial detainees or convicted

prisoners who received more favorable medical treatment.
Lastly, Plaintiff presents no evidence to suggest that any
potential denial of medical treatment was motivated by intent to
discriminate rather than for a legitimate state interest or even
negligence.  As such, Plaintiff's allegations fail to state a
plausible equal protection claim, and Defendants are entitled to
summary judgment on the claim.

**IV.  Conclusion.**

Based on the foregoing, it is recommended that Defendants'
Motion for Summary Judgment be **granted**, in part, and **denied**, in
part as set out below:

1.  It is recommended that Defendant **Dallas County, Alabama**
    be **GRANTED** summary judgment on the claims against it and
    dismissed from this suit in its entirety.

2.  It is recommended that Defendants **Huffman, Brown, and
    Davis** are **DENIED** summary judgment as to the **Eighth
    Amendment claims of deliberate indifference** asserted
    against them, and said claims will continue.

3.  It is recommended that **all other claims** in this action be
    **dismissed with prejudice.**

The instructions that follow the undersigned's signature
contain important information regarding objections to the report
and recommendation of the Magistrate Judge.

**NOTICE OF RIGHT TO FILE OBJECTIONS**

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. L.R. 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**ORDERED** this 6th day of September, 2018.

/s/ Katherine P. Nelson
**UNITED STATES MAGISTRATE JUDGE**